Good afternoon. To continue with this afternoon's hearings, the next case is number 09-5128, Hazelhurst v. Health and Human Services. Mr. Webb. May it please the Court, Counsel. Thank you for this opportunity. Surely. The Special Master correctly characterized the laboratory testing which has found evidence of a persistent measles infection in children with regressive autism as the linchpin of the Hazelhurst claim for compensation under the National Vaccine Injury Compensation Program. This laboratory testing was critical to the Hazelhurst case because it provided objective evidence that a measles infection could play a role in the cause of regressive autism. Could, but what is your position as to what needs to be shown? What is my? Your position as to what needs to be shown when you said it could play a role. Possibility, I think the precedent shows, is not enough. Certainly more than a possibility. What needs to be shown is that the vaccine did, can play a role in causing autism and that it did in this case. Any, no single piece of evidence needs to prove all that. In the context of autism and measles vaccination, it is critical to the petitioner's case that the vaccine is a possible cause of autism and then you can look at other evidence. In other words, this clinical testing that shows measles virus in the, in this case, the guts of children with autism, and there wasn't a specific test in the Hazelhurst case, but this evidence that shows measles in the guts of children with autism supports the proposition that measles, which is a virus that causes neurologic illness, is present in the intestines of children that develop regressive autism. And that, it was a beginning point for the testimony of the Yates-Hazelhurst treating neurologist, and it was a starting point for the hypothesis that, and a way to test the hypothesis, that measles vaccine could cause autism. That's why I used the word objective at the beginning. Most of the evidence in the autism cases and in the Hazelhurst case, so I won't talk very specifically about it, but if you will, there were kind of two pathways to come down. One was the general hypothesis that measles vaccine creates a persistent measles virus infection in the child, which damages the brain in a way that causes him to regress, to lose developmental skills that he had otherwise learned, and the end result being autism. A very related, somewhat independent, was the opinion of Yates' pediatric neurologist who testified in his opinion that in a subset of children with autism, you observe a regression after MMR vaccination, and that the measles virus from the measles vaccine was implicated as a potential, and in his opinion, probable cause. Well now, when you say his opinion, wasn't his opinion just repeating the opinions that were already out there? No, not really. I mean, I think that it's hard to say that they're certainly closely related, but they were independent in the sense that Dr. Corbier's opinion was different. His approach, his analysis was different than that presented by Dr. Kinsborn in the Cedillo case, which was also part of the record in this case. He has two neurologists that came to the same conclusion using somewhat different rationales. Dr. Corbier's opinion was based more upon his own experience, and his experience of seeing many children that he has treated who develop autism after vaccinations, and the MMR vaccination in particular. And Dr. Kinsborn's was based probably more upon a more in-depth study of the medical literature involved. And what's important in both these neurologists' opinions, they testified to get to their opinions, they had to come to the conclusion that persistent measles and virus infections had been proven or had been established. Let me just say that now. That laboratory testing had found evidence of a persistent measles virus infection in children who regressed into autism. And so, whichever of the neurologists, whether you rely on Dr. Kinsborn in the testimony that was presented in Cedillo, or in the testimony of Dr. Corbier, James Hagerford's treating neurologist, you can't get to their opinions fail if the evidence that there is a persistent measles virus infection in children with progressive autism is not reliable. And so, in either case, if the special mask was correct, it was a lynchpin, if there is no evidence, if it's not more probable than not that there is a persistent measles virus infection in children with autism, then we couldn't win. Maybe I overstated the more probable than not. In other words, Dr. Kinsborn and Dr. Corbier both said explicitly, my opinion depends upon the validity of this laboratory testing that has found measles virus persists in children with progressive autism. In saying that, is he referring to Unigenix, or is he referring to Walker, or is he referring to both? In making that statement, it relies on previous laboratory testing. Is he referring to Unigenix, Dr. Wakefield, or is he referring to Dr. Walker, or is he referring to both, or something else? Both and more. Unigenix is not Dr. Wakefield. To the extent that that impression has been given, that is inaccurate, and the record makes it clear it's not. Dr. Wakefield did participate in generating the samples that were tested by Unigenix. The principal in Unigenix was Dr. O'Leary, who is a well-respected microbiologist, I believe, or something more specific, from Dublin, Ireland. Although he tested samples that were done by Dr. Wakefield, he is not Dr. Wakefield. Dr. Wakefield played an important role, probably, in generating the hypothesis. That's what I want to focus on, because this testing tested the hypothesis. So we rely on both the information from Unigenix, the information from Dr. Walker, and there are also some other laboratories that are less important. And there's some argument about whether their association with Unigenix was not sufficiently independent. So we really should focus on Unigenix and Dr. Walker. It really didn't test the entire hypothesis, did it? It tested perhaps the first half of the hypothesis, that there was something in the measles DNA which is somehow incorporated into the subject. But the next step as to the effect of that still remains uncertain and without the benefit of probabilities. Isn't that so? I'm not sure I understood the question. I apologize. Could you try again? It's one thing to show that when an infant is vaccinated for the various illnesses, to show how that works, that the presumably inactive piece of the toxic material is somehow incorporated into the cells. Perhaps that's how immunity works, that I don't know. But the next step then as to the neurological effect, this particular neurological effect, there are still very large gaps, are there not? In fact, I think all we have is theory. You're absolutely right. Let me say one thing I want to clarify. The measles material that was found in the gut and in some cases in the cerebral spine fluid is not believed to be inactive. It's believed to be an indication of an active measles infection. The theory being that the vaccine is defective because it included active rather than inactive viral measles or whatever? It's not defective because it's activated. Because the measles vaccine is not an inactivated virus, it's a live virus. It's designed to cause an infection. It's designed to cause a subclinical infection which triggers immunity. But it's an attenuated strain from the wild type, right? Exactly. It's different in the sense that it is a less virulent version. It reproduces less aggressively, it causes fewer problems, and when it works right, in most vaccine injury cases, it's not a matter of a defective vaccine in any way. It's a matter of an unfortunate host response. We don't know what it might be in autism. Perhaps these children are unable to clear the virus in a way that your typical child does. And the issue of whether some kind of vaccine-related immune suppression exists is not present in this case. It is present in the Sodeo case, the other test case, but it is not present in this case. Well, we know as a fact which children, which infants manifest the autism syndrome. But I couldn't find where the link had been shown between the virus or the attenuated virus or however the infant's system processed it and this neurological effect. Now that's a good question, too. Because so much emphasis was focused in this hearing on whether the virus was really there, there wasn't that much testimony on whether the fact that the virus was there would be enough for our case. And I'm not 100% clear on where the record is on that. I will say that for both Dr. Kinsborn, who testified in the Sodeo case, and Dr. Corbier, the presence of the virus in the gut was enough to suggest both a persistent measles infection and that it was a probable candidate for the cause of the neurologic regression they observed in children with regressive autism. Probable or possible? I'm sorry? Probable or possible? Probable. Well, probable candidate doesn't mean probable cause, right? They came to the conclusion that it was a probable cause. But the process they came to was, first, it's a candidate. Yeah. The measles virus had a tendency to cause neurologic injury. Now there was a considerable controversy in this case on whether it had the tendency to cause the kind of injury observed in the regression in autism. That's a difficult question because the position of the respondent, way in the right, that there is no injury in autism. But, in other words, for both Dr. Kinsborn and Dr. Corbier, the fact that the measles vaccine, the measles virus, causes neurologic injury and that it was found in the guts of children with autism, and both Guapo and Unigenix. Guapo only tested guts. Unigenix also tested central cerebrospinal fluid. Because it was found in the guts of children with autism by both Walker and Unigenix. And they believed it was reliable. They believed that the presence of a neurotrophic virus in children that suffer neurologic regression made it a candidate. And that their testimony, their opinion concerning the nature of other known syndromes, illnesses caused by measles virus, made it a more probable than not cause of the regression observed in autism. And I think I'm mostly done with my 15 minutes. I'll step down with my extra 45 seconds when I get done. Well, Adele, let's hear from the government. We'll save you rebuttal time. I'm sorry? I said we'll save you rebuttal time. Thank you. Okay. Ms. Ricciardella? Yes. Good afternoon, Your Honors. May it please the Court. Your Honors, the Special Master's 200-page decision reflects a very careful and well-reasoned analysis of an extraordinary amount of evidence. If we were to rule against you, would we have to rule that that opinion reflects arbitrariness and capriciousness? Yes, you would. You'd have to rule that her factual findings were arbitrary and capricious, and really what the appellants in this case are arguing is an abuse of discretion standard. They're saying that her admission and consideration of Dr. Buston's reports from the U.K. and his testimony about those reports, that she somehow abused her discretion in allowing it, and also the weight that she gave it. They're alleging it's an abuse of discretion. So, yes, Your Honor. I'm sorry. Go ahead, please. No, you go first. All right. You started off referencing 200 words, 200 pages. You know, that cuts both ways. When you write 200 pages, are we to assume that she put down everything she found significant? And doesn't that cause you problems with regard to Walker? It's an irony sometimes that thoroughness can lead to the conclusion that everything she looked at was in there, which may not work well on the sequencing issue as it relates to Walker. Absolutely. I agree that it can cut both ways. I mean, the case, the decision was 200 pages, and concomitantly the other two special master's decisions were equally long because this was an extraordinary record. And I think we had over 5,000 pages of hearing testimony, 50 expert reports. Just, as one special master said, it dwarfed by far any evidentiary record that we've seen in the history of the program. But I don't believe that that also applies to her consideration of Walker. While she may not have discussed the sequencing aspect of the Walker study, she did talk about the Walker study and why she did not find that to be a credible study, why she did afford that very little weight. And the sequencing aspect is just one part. The parents are really looking at the tree but not forgetting to look at the forest. So are we to assume she didn't look at the sequencing aspect because she didn't put in her very thorough report? I don't think that we can assume that. I think that what she did talk about the Walker study is what she found most significant with the problems of that study, primarily that it's unpublished. I mean, we're four years on from the poster presentation in 2006. The study is still unpublished. The data has not been released. The scientific community cannot scrutinize it. Dr. Hettner, the appellant's own expert, said that the data is preliminary, that we cannot draw any biological significance from that. That is what the special master found most persuasive about the Walker study, or I should say the lack of persuasiveness of the Walker study, not the fact that they sequenced it. If they sequenced it, fine, but they haven't published that. I mean, how do we know they sequenced it? We don't know. We haven't seen their sequencing data. The fact that it remains unpublished supports the special master's conclusion that it's just simply a study that she cannot afford any weight at all. Well, in that case, you know, one of the things that is striking when you look at the length of the detail that the administrative judge went into, we're here in a stage where there are still many unknowns of the science. And perhaps it's easy at this stage to criticize experiments that aren't completely controlled as the evidence comes to light. But there are certain things that are known. There is a certain incidence of autism, which is becoming known, becoming documented in greater detail. There are certain facts as to how the vaccines operate within the body that were previously known. We have, I don't want to call it the cause, we have the events of the sequence of the vaccinations. We have, at the other end, an adverse neurological impact. And we have an evolving body of data. It's very easy to criticize one scientist or one physician who didn't do, reminiscent of the Daubert cases. They didn't do that kind of controlled experiment. We aren't yet at that stage. But isn't one of the things that the government needs to think about, and HHS, is whether, in fact, do you need the 95% statistical probability? Do you need, at this stage, the more likely than not? Or would it suffice, or should it suffice, at this stage, if it is shown to be medically, therapeutically, scientifically possible, as one proceeds to develop the causal relationship by enhanced procedures and the increased knowledge that are being gleaned of what happens inside the body and inside the cell? There's a lot to your question, Your Honor, but I would say at this stage, we're not even at the stage where it's medically or scientifically possible. This is not a field of science that is bereft of research. Studies have been done looking at the causal connection between autism and MMR, autism and thimerosal, and every credible study has shown that there is no causal connection. So we can't say that this is... Well, they show that it hasn't been established, but they haven't shown that it has been proved that there's no causal connection. It's at the burden of proving that there is a causal connection. Well, with all due respect, Your Honor, in science you cannot prove a negative. No epidemiological study can ever show definitively that X doesn't cause Y. That's just simply a scientific impossibility. But what we have here, we have a theory of causation that the measles virus persists in a child that somehow enters a child's brain to cause autism. And I believe, Judge Newman, you said that the measles virus persistence was just one step in their theory. That's correct. The other... It was our position, and the court agreed, that they did not sustain their burden in showing that the measles virus from the MMR vaccine can persist in a child's body. But the analysis doesn't end there. Then what happens when the measles virus is in the brain? There was ample evidence by world-renowned experts that responded to the court in virology that says, when you have a measles virus in the brain, you die. You do not get autism. You have cell death. You have neuronal death. That's not autism. And the special master found the testimony from respondents' experts to be far more credible than that of the petitioner. So we have a presumptive theory of causation in this legal case, and the petitioner simply just did not meet their burden of persuasion. They did not show more likely than not that either the measles, the MMR vaccine, or the thimerosal-containing vaccines cause autism. When you say you can't prove a negative, a scientist can't prove a negative, that means it's a constant search. The search must go on because you can't prove a no. The thing that impacts me is if we make a ruling, we have precluded the ultimate resolution of Dr. Walker's survey. We've put a stop to it, at least concerning this particular claimant, and that's a difficult thing to do if it's an ongoing search. Why not remand it and wait and see what happens when Walker gets published, or if Walker gets published? Well, I mean, it's been four years, and how long must the Court wait? And it's not just Dr. Walker. I mean, there have been other laboratories that have published their data, that have tried to replicate the testing from immunogenetics and simply were unable to. So I would submit to Your Honors that that, and this is what this Court found most persuasive, the published studies that are out there that have tried and failed to replicate the data, that is more persuasive than the Walker study, which is just one piece of this massive evidentiary record. The Walker study, I mean, we don't know where it is. It could be defunct now. We have no idea where that study falls. It hasn't been published. Why hasn't it been published? Have they packed up? We don't know. But that's what the special master said. She just could not, in the face of all this other persuasive evidence, Dr. Buston's testimony, Dr. Ward's testimony, Dr. Griffin's testimony, the published data that's out there, that, when you're balancing, and this is her discretionary decision, when you're doing a balancing, the published, more credible studies out there far outweigh this unpublished Walker study that really was just an abstract, was a one-page poster presentation. I thought that Dr. Heppner had said something to the effect, and my recollection may be imprecise, but something to the effect that there was an ongoing effort to deal with the problem of the controls in the Walker study. She did say that. That's correct. So that, presumably, there is ongoing work. It's not simply been abandoned, and there's evidence to that effect. But this was two years ago, Your Honor.  Three years ago, actually. Pardon me? We don't know, although you may, in fact, know, but for purposes of the record, in this case, there's no way. They may have published last month, but we wouldn't be privy to that information for purposes of review of the record. Sorry. But, again, is this assumed for purposes of argument that, yes, the Walker study was able to validly sequence their data? I think that that's still very much open for argument. Dr. Buston looked at the abstract and said that it just was, from the face of it, it was scientifically unsound. But let's just assume for purposes of argument that they were able to sequence their data. The Walker study is but one study. Again, you have to look at the entire evidentiary record. Section 13A of the Act compels the special master to look at the totality of the evidence. But when you talk about Buston looking at Walker, isn't it disturbing that Buston didn't seem to know that Walker might have involved sequencing? Well, I don't believe that it was on the face of the abstract. I believe that came out during Dr. Hebner's testimony. But regardless, and as I believe it was Judge Weiss who pointed out, Dr. Buston was not cross-examined on his testimony with regard to the Walker study, which Judge Weiss found to be very compelling. So just getting back, the Walker study is just one piece of evidence in this enormous evidentiary record. And I do not believe that this Court could find that the special master abused her discretion in deciding to afford the Walker study very little weight when she had this other evidence in front of her that she found to be much more persuasive. I'm a little uncertain, well, I'm quite uncertain about exactly what Dr. Buston's testimony was with respect to the genetic sequencing in Walker, that he was critical of the procedures employed. It's my understanding that I don't believe he testified about the genetic sequencing in Walker. He was critical of the lack of controls of the Walker study. It's my recollection that he never got into the genetic sequencing. So unless the Court has any questions with regard to the admission of Dr. Buston's testimony and with regard to the United Kingdom litigation, I'd be happy to go into the timeline of that. But if the Court doesn't have any questions, I will be at your discretion. Well, if you raise the issue then of Dr. Buston and the Ireland or United Kingdom testimony. Basically, expert testimony, laboratory work out of Ireland, the unit genetics information was presented, correct? That's correct. And that would generally be deemed to be expert testimony, correct, of a sort? Correct. And your opponent is saying that there's insufficient background to allow the cross-examination of Dr. Buston on that, right? That is what he's saying. Frankly, it strikes me that the result then should be that the original testimony should be stricken, not the efforts of Dr. Buston to attack it with what information was available at that time. And I didn't see that developed in any of the arguments, and I'm wondering about that. Now, of course, this isn't a court of law. This is a court of law, but the proceedings are not subject to regular litigation efforts. And I realize the issue is fairness and such, but it still seems to me that if the allegation is there was insufficient background evidence coming out of Ireland, I'm not convinced the correct approach is to therefore strike the cross-examination of what evidence there was. Strike the cross-examination? What appellants are arguing, I believe, is that they're saying because they didn't have the background data that Dr. Buston looked at, they couldn't mount an effective cross-examination. And that background evidence was the core evidence supporting the original report of Unigenetics. Correct. It strikes me that if you lack that core evidence, that the approach should not be striking Dr. Buston's attack on the original evidence, but perhaps it should be striking the original evidence out of Ireland. Well, that's one approach. It wasn't the approach that, I mean, you didn't move to exclude that evidence. No, that's correct. That's correct. Right. No, we responded to not become aware of the importance of Unigenetics for play in these test cases until January of 2007, when petitioners filed their initial expert reports into the Cedillo case. And all of their experts, the majority of their experts, said that one of the crucial pieces of evidence for them to render an opinion in these cases was the finding of persistent measles virus in the gastrointestinal tissue of Michelle Cedillo and Colton Snyder. And that although we do not have an actual test result in the Hazelhurst case, Dr. Courbier relied very heavily on the Allman article, and the Allman article discussed the Unigenetics testing. So the respondent, we were prepared to go forward with what is published out there criticizing Unigenetics, the laboratories that had tried and failed to replicate the data. How many efforts were there? Is it three separate efforts? I believe there's two or three laboratories that tried to replicate using the primers that the Unigenetics lab did and failed. And there's also been other published criticisms by the scientific community by the fact that Unigenetics never published their data. So it didn't allow the medical and scientific community to scrutinize their findings. So there's sort of a two-tier. It's one, labs tried with the primers that were published to replicate, and two, the lack of the underlying data that Unigenetics failed to publish. The general order that the scientific community communicates, at least to the judiciary, is that these great unsolved, unresolved questions will, just as a matter of time, ultimately be resolved as techniques improve, as the amount of data is enlarged, as the various probabilities have enough of a statistical base to be reliable. What happens then, and the theory, the approaches you presented, is that until something has been proved, there is no opportunity for prevailing under the Vaccine Act. So what happens if several years from now it's determined that, in fact, there are relationships which haven't yet been established? Are these complainants out of the loop? Are there opportunities to come back to HHS for relief? On this particular theory of causation, my understanding of the way the Act works is no. I mean, they would be precluded. But if somehow science finds, say, the DTaP vaccine causes autism, then I believe that these claimants could, under a different theory of causation, come back in. But as to MMR and thimerosal-containing vaccines, the theory of causation presented in the AAP, now, another petitioner may have a different permutation of that theory, and they're certainly entitled to a hearing on that different permutation. I think Judge Newman's question is actually a very probing question, which may have broader implications, and I'm curious about it. I mean, suppose it becomes, after this case is over, and suppose that it should turn out that this case is resolved against the petitioner, and it becomes very clear, unimpeachably clear, five years hence, that this very theory is, in fact, perfectly valid, so valid, that this injury is put on the table, let's say. Would these specific complainants, these petitioners, be excluded by res judicata, if everybody else has an automatic ticket to recovery? We're not going to... That's right. No, I understand. My understanding is, frankly, I don't know, and I don't want to speak out of school. My gut reaction, and I hate to speak for the Department of Justice and HHS, is that these particular claimants, yes. Well, I suppose maybe one answer to my question would be that if Congress decides to put a new injury on the table, they can decide at the same time to make that decision, in effect, applicable to everybody, including everybody who's already been subject to what otherwise would be a res judicata claim. Absolutely. Congress can certainly put whatever language they want to into the Act, yes. Okay. Any more questions? Thank you. Thank you. Mr. Cadella? Mr. Wave? Thank you. I'm going to try hard to answer some of the questions. First of all, I want to answer my opinion on Dr. Guilford, Dr. Jess Guilford's question. In a proceeding that was governed by the rules of evidence, I don't think Dr. Buston would have been allowed to testify, because there was inadequate foundation. Well, likewise, would the Unigenetics report have been presented without all the background information? That's my question. That is my question. We're focusing on disqualifying the person who attacked Unigenetics because there was not sufficient background information from Unigenetics. It seems to me the approach might be to strike Unigenetics. Well, there was a published report from Unigenetics, actually two. And one of the criticisms was that it was inadequate, the information about how they did the process. But this is the question. The whole notion of going behind laboratory results that were produced by a reputable laboratory and looking at them with the kind of detail that Dr. Buston did and then saying, trust me, I found problems. When he didn't provide any substantial foundation, he provided a couple pages of information, maybe a dozen pages out of the hundreds or thousands that he looked at as foundation. The question is, one thing I want to say, and it's in the brief that I'm going to start on in one second, is the program, the compensation program works because we use a more, we use a limited universe of information to get to the decision of whether or not we compensate a child. And in the case of Buston, it went completely haywire. We started incorporating more information and more questionable information than would ever be allowed in the most complex of tort litigation. It shouldn't be allowed. $400,000 worth of information. When I make these decisions, I am surprised, or the Haydenhurst decision, I am surprised by how little information is there and how little consideration was given to the Walker test, the Walker Laboratory testing. And just as, and more importantly, Dr. Karen Heppner testified in this proceeding via CDO. She is the PhD microbiologist that did the testing in the Walker Laboratory and that found the evidence of a persistent measles infection in the Walker Laboratory. She explained what they did and in the context of testimony from the actual scientists doing the work, the absence of publication is of little importance. And the fact that that was not only, I mean, it wasn't even mentioned in special, the sequencing wasn't even mentioned in Campbell Smith's decision. The absence of publication relates to peer review and we've been told by the Supreme Court that that's very important. It's a criteria. It's not an exclusive criteria. It's not required. And then the Supreme Court has said that their criteria are criteria. And this is a clear case of where there was an actual, not full litigation scientist who had done the groundbreaking research and actually was persuaded to come and testify. And she was not, well, at least the critical evidence on sequencing was ignored. And my colleagues have talked about the future, so I'm compelled to ask, do we know if Walker will ever be published? We don't know. I suspect it will be published. It hasn't been published yet, but it's not in the record. There has been a publication since this record that provides, I believe, support for the premise that the testing was reliable, but it was a double-edged sword. It tended to not support the premise that the presence of the measles virus in the gut was meaningful to the cause of autism. But, of course, that's not this record. My point being, the future, the fact of the matter is that Yates-Hazelhurst will not receive compensation in the National Vaccine Injury Compensation Program if she did not reversion this case to the special master. Dr. Boston suggested, based upon his review of the poster that was presented at the Walker abstract and poster presentation at the AMFAR, the Autism Research Get-Together, that he had some questions about the sequencing, whether it was done. But he didn't comment in detail about it. So he did mention the sequencing. I'm sorry? He did mention the sequencing. I thought that there was evidence of that. He looked at something on the poster and said, I don't know if that was done. But we have the doctor that did it that says we did it. And I think that, frankly, I think this is a rational to disagree with Dr. Heppner, who everyone conceded was honest and straightforward and said we did it, and take Boston's testimony on that side. Okay, but the special master didn't find that the sequencing was not done. No, no, no. He just didn't mention the sequencing. But since both Dr. Boston and Dr. Heppner referred to the sequencing, it's pretty far-stretched, isn't it, to suppose that the special master did not understand that evidence? No, not far-stretched. There was so much evidence, she missed the most important thing. But to say she missed it, she didn't comment, she didn't reference that piece of evidence. But all the testimony, not just from Boston and Heppner, but from Ward and Griffin, said the best measure of the reliability of this kind of testing is sequencing. Everybody said that, and then not to mention sequencing, suggested she, and not give, to give so little weight to the Walker testing and Dr. Heppner's testimony, which are two things. To not weigh those, give them any weight, and then not mention sequencing, suggests that she missed a critical aspect of what the Walker people had done. And I think that makes it, this decision, arbitrary and capricious. Because this critical information, now there is lots of information in the records, but whether or not measles virus can be found in the guts of children was important enough that if we did not get a fair hearing on that issue, if we did not get a full consideration of the record on that issue, the case needs to be remanded to Special Master for consideration, both of the eugenics testimony without the testimony from Dr. Boston, and for consideration of Dr. Walker. Either of those would be sufficient for her to change her mind on whether the testing was reliable. And that's why the case should be remanded. Okay, any more questions? Any more questions? Thank you. Thank you, Mr. Webb, and thank you, Mr. Fiabella. Case is taken into submission. All rise. The Honorable Court is adjourned until tomorrow morning at 10 a.m. Thank you.